IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 4, 2015

## ANTONIOUS JAMAL BROWN v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Gibson County
No. 8946      Clayburn L. Peeples, Judge**

_____

**No. W2014-01820-CCA-R3-PC  -  Filed November 12, 2015**

_____

The petitioner, Antonious Jamal Brown, appeals the denial of his petition for post-conviction relief from his first degree murder and aggravated assault convictions, arguing that he received ineffective assistance of counsel at trial and on appeal.  Following our review, we affirm the judgment of the post-conviction court denying the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which ROGER A. PAGE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Tom W. Crider, District Public Defender; and J. Daniel Rogers, Assistant Public Defender, for the appellant, Antonious Jamal Brown.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Garry G. Brown, District Attorney General; and Jason Scott and Hillary Lawler Parham, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

In  February 2012, the petitioner was convicted by a Gibson County Circuit Court jury of the first degree premeditated murder and aggravated assault of Vincent Brown, who was shot to death and struck by the petitioner's car on a Humboldt street on November 5, 2009.  The petitioner was sentenced to consecutive terms of life imprisonment and six years, respectively.  His convictions were affirmed by this court on direct appeal, and our supreme court denied his application for permission to appeal.  See State v. Antonious Jamal Brown, 2013 WL 1908171, No. W2012-01362-CCA-R3-CD, at *1 (Tenn. Crim. App. May 6, 2013), perm. app. denied (Tenn. Oct. 17, 2013).

The State's theory at trial was that the petitioner, who had been robbed by the victim and had hard feelings toward him, procured a gun, shot the victim, ran into him with his vehicle, removed money and/or other valuables from the victim's body, planted the gun on the victim, and fled the scene. The defense attempted to show that the victim was the one with the gun and that he accidentally shot himself after he pulled his gun on the petitioner and the petitioner ran into him with his vehicle. There were several eye and ear witnesses to some or all of the events that led to the victim's death. The direct appeal opinion provides the following summary of the evidence presented at trial:

> This case arises from the November 5, 2009 shooting death of Vincent Brown ("the victim"). As a result of that investigation, the [petitioner] was indicted for first degree premeditated murder and aggravated assault on March 1, 2010. His trial was held on February 15, 2012, and the following evidence was presented.
>
> Kanesha Graves testified that between 3:00 p.m. and 3:30 p.m. on November 5, 2009, she saw the [petitioner] and the victim on Craddock Street, the intersection where the crime occurred; the [petitioner] was driving a white car. Ms. Graves was talking to both men, and when they finished their conversation, the [petitioner] walked towards his car, and the victim walked the opposite way. The [petitioner] then turned away from his car, "pulled his pants up and went the other way toward [the victim]." Then, as if he had changed his mind, he went back to his car and sped off before Ms. Graves could start her car. Ms. Graves testified that neither of the men seemed angry.
>
> Sharlice Bradford testified that she was inside her mother's home at 1007 North Fifth Avenue when she heard a noise outside; it sounded like a firecracker. She testified,
>
>> So I walked toward her front door. And when I walked to her front door it was a car coming up in the yard and it was going out of the yard.
>>
>> It got to the stop sign on the corner of Fifth and Maclin Street. It went up the corner [on Maclin]. It came back, pulled back in front of the yard where the young man was laying.
>
> Then, the driver, later identified as the [petitioner], got out of the car, turned the victim over, got something out of his pocket, and turned the

2

victim back over.  He had something black in his hand and laid it beside the victim.  The [petitioner] got into his car and went up the street on Fifth and Craddock.

Ms. Bradford testified that she did not notice the victim lying there until the car returned.  Ms. Bradford further testified that the car was a white Dodge Neon and identified the car in the photograph presented to her by the State as the car that drove into her mother's yard.  She stated that she could not identify the [petitioner] because he never looked up or made eye contact with any of the onlookers, even after her mother told him not to touch the body, which was lying in the lot on the side of the house.  Ms. Bradford went inside and called 911.

Dorothy Smith, Ms. Bradford's mother, testified that she was cooking when her daughter told her to come to the door to see a car that was going across her yard.  When she came to the door, she saw the [petitioner] returning to the scene, and he went toward the victim who was lying in the yard.  This was the first time she noticed the victim.  Ms. Smith testified that the [petitioner] approached the victim, and she told him not to move the victim.  The [petitioner] did not respond; he just got back in the car and drove off.

Jonathan Wilson, an officer with the Humboldt Police Department (HPD), testified that he was the first officer to respond to the scene, that he arrived at approximately 3:45 p.m., and that the ambulance had not yet arrived.  He stated that the victim was lying in the yard, a few feet from the road, and that there was a gun laying on the victim's stomach.  Officer Wilson determined that the gun had been fired.  He then sent the suspect's description and vehicle information out over the police radio: white Dodge Neon, black male driver.

Joshua Carter, an investigator with the HPD, testified that he was on patrol when he received the initial call about the incident.  Shortly thereafter, information on the suspect's car was dispatched on the police radio.  Approximately ten to fifteen minutes later, Inv. Carter saw a white Neon with a busted windshield.  He proceeded to stop the car because it fit the description from dispatch, but the car sped up.  Inv. Carter turned on his blue lights and pursued the car.  He was a few blocks away when the black male exited the car and "took off running."  Inv. Carter identified the suspect as the [petitioner].  After backup arrived, the [petitioner] was

3

located in a garbage can with some cell phones, approximately 100 yards from the Neon.

Raynard Buchanan, an investigator with the HPD, testified that he took photos of the crime scene and helped collect the gun shot residue (GSR) kits from the [petitioner] and the victim. Inv. Buchanan testified that he went through both the [petitioner's] and the victim' phones and that there were seven short phone calls between them within an hour prior to the incident. Inv. Buchanan said that the victim was not dead when officers first responded to the scene, but the victim died a day or two later. He took DNA swabs from the victim two days after the incident.

Deandre Perry testified that he was in the car with the victim thirty minutes before the shooting. Mr. Perry stated that there had been a white car following him when he dropped the victim off on Fifth Street. He had previously identified the white Dodge Neon as the car that had been following them but did not know who was driving the car.

Prentiss Johnson testified that he was with the victim the night before the incident. The victim said that there was trouble between him and the [petitioner] and that he did not feel comfortable walking or being by himself. Mr. Johnson stated that he would give the victim rides and that the victim was on the way to Mr. Johnson's house when the incident occurred.

Karen Chancellor, the chief medical examiner for Shelby County, testified as an expert in forensic pathology. She stated that the victim had an entrance and exit wound to the head caused by a gun shot and that this was the cause of his death. The gun shot was close range, fired approximately two to ten inches away from the victim's head. The victim had various other injuries consistent with being a day old or less. On cross-examination, Ms. Chancellor testified that it was possible that the victim could have shot himself but that she did not have any evidence to support that theory.

Sherida Dowell testified that she saw the victim go into Jerry Fitzgerald's house and that she saw Aaron Brown get out of a white vehicle and go into Mr. Fitzgerald's house behind the victim. Approximately ten minutes later, she heard a gun shot and went to the door. Ms. Dowell testified that the car that was in front of Mr. Fitzgerald's house was now on Fifth Street, and the [petitioner] was in the car. She then saw the [petitioner] go over to the body, and he appeared to be feeling on the

victim, but she could not tell exactly what he was doing because she was a distance away. Ms. Dowell stated that Michael Gooch, her child's father, was not present when the incident occurred.

Tory Phillips testified that he was walking down Craddock Street when he heard a gun shot. He then heard a "big thud sound" and saw the end of a white car turn the corner. Mr. Phillips testified that the [petitioner] had approached him a few days earlier and asked if he knew anybody that would sell him a gun.

Tony Williams, an investigator with the HPD, was the lead investigator in this case. He testified that he interviewed the [petitioner] on three different occasions to get the [petitioner's] version of the events involving the November 5, 2009 incident. The [petitioner] did admit that he was the driver of the white Neon and that the phones found with him in the garbage can were his. In the first interview, the [petitioner] said that he was driving down the street when he was flagged down and that two unknown men jumped in the car. He was robbed of $100 at gunpoint. He then blacked out and the car rolled forward, possibly hitting one of the men. The [petitioner] said that he got out of the car and rolled the victim over to look for his money and that was when he saw the gun fall out of the victim's pocket.

The next day, Inv. Williams sought to get a second statement after he had talked to witnesses and discovered that the [petitioner] laid something near the body, but the only thing found next to the body was the gun. Inv. Williams also asked the [petitioner] about whether his DNA or fingerprints would be found on the gun, and the [petitioner] told him that he brushed the gun with the back of his hand when he flipped the victim over to retrieve his money. The [petitioner] also told Inv. Williams in the second interview that the victim turned around and "probably was getting ready to shoot at [him]" and that was when he hit the victim, his window busted out, and the victim shot the gun. However, the [petitioner] stated that he was going about five miles per hour and that he only bumped the victim. The [petitioner] stated that he did not recall whether the victim "went . . . flying through the air."

The third statement was taken at the Gibson County Correctional Facility on November 9, 2009. According to the [petitioner], he was standing in the street talking to the victim and another man when the victim robbed him. The victim flagged down someone in a gray Lumina and gave

5

them some money, and they drove off. He asked for his money back, and the victim told him to "charge it to the game." The [petitioner] then stated, "[a]fter I came back I grabbed the bag to see what it was. It was a plastic bag with three small plastic bags in it. I went to my grandmother's house. I've been robbed and told several people and gave the plastic bag to [a male there]. This took place after I hit the body." The third statement was not recorded, at the [petitioner's] request. However, Inv. Williams hand wrote the statement, read it to the [petitioner] to ensure that it was exactly what he had said, and had him sign it.

Inv. Williams stated that during his investigation, Mr. Phillips came to talk to him about the [petitioner's] approaching him about purchasing a gun and that Mr. Phillips's testimony was consistent with what he had told him previously. Inv. Williams testified that he also spoke with Ms. Dowell, that she told him several times that Mr. Gooch was not present when the incident occurred, and that her testimony was also consistent with the statement she gave him during her initial interview.

Charles Hardy, an agent in the DNA unit with the Tennessee Bureau of Investigation (TBI), testified as an expert in DNA analysis. Agent Hardy analyzed the DNA in this case and offered the following findings: the victim's DNA was found on the windshield of the [petitioner's] car; a beer bottle found in the car contained the [petitioner's] DNA; and the DNA found on the steering wheel of the car did not match the victim or the [petitioner]. Agent Hardy also analyzed the gun and found DNA profiles suggesting two contributors: the victim, a minor contributor, and an unidentified person. The [petitioner] was excluded as a contributor.

James Russell Davis, II, a special agent and forensic scientist for the TBI crime laboratory in Nashville, testified as an expert in GSR analysis. He explained that GSR analysis involves the testing of three elements "that are not natural of the human body": antimony, barium, and lead. Agent Davis analyzed the [petitioner's] GSR test, and while all three elements were found on the [petitioner's] hands, he tested inconclusive for GSR. The [petitioner's] antimony level tested at the threshold level, but the [petitioner's] lead and barium levels were low. However, Agent Davis explained that changing clothes, wringing your hands, or physical activity--such a[s] running from the police and hiding in a garbage can--could reduce the quantity of the elements. Agent Davis testified that both the victim's hands and the car tested negative for GSR.

Rachel Autry, a paramedic for Gibson County, testified that she transported the victim to the hospital and that no one washed or otherwise cleaned the victim's hands while he was in her care.

Michael Gooch testified for the defense. Mr. Gooch testified that he witnessed the November 5, 2009 shooting between 2:00 p.m. and 3:00 p.m. while standing on Ms. Dowell's porch on Craddock Street. He stated that Ms. Dowell was his child's mother and that she had just returned from picking their child up from Head Start. Mr. Gooch testified that he saw "[a] white car come down the street and make a right and the [victim] pulled out a gun and he swerved and then [the victim] went flying in the air and the gun went off." Mr. Gooch said that he was not certain why Ms. Dowell told officers that he was not at her home on that day but stated that it could have been because, at that time, he was on the run from police for aggravated assault and reckless endangerment charges, to which he later pled guilty. On cross-examination, Mr. Gooch admitted that he only recently came forward with this information because, initially, he did not want to get involved.

The [petitioner] testified in his own defense. According to the [petitioner], the victim called him on November 5, 2009, asking whether he was picking up Aaron Walker. The [petitioner] stated that he did not know the victim. Later, he was driving down Maclin Street to pick up Aaron Walker, and the victim was standing in the street and flagged him down. He gave the victim a ride to Jerry Fitzgerald's house. "When [he] stopped that's when [the victim] robbed [him] with the black gun [the victim] had." The victim then called someone, who the [petitioner] believes was Kanesha Graves because she and her husband pulled up in a gray Lumina. The [petitioner] said that he asked the victim, "can I get that?" and the victim gestured towards his concealed weapon. The [petitioner] stepped back, and the victim "walked backwards." The [petitioner] then walked to his car; Kanesha Graves left before he did. He left the scene but returned after saying a prayer about getting his money back, driving approximately five miles per hour. As the [petitioner] was about to approach the victim, the victim aimed the gun at him. The [petitioner] stated, "I seen my life flash in front of my eyes. Not only my life but the innocent bystanders of people that I went to church with back in the day in that area life flashed, too." He took his hands off the steering wheel, and the car went toward the victim and into the grass. The [petitioner] explained that he mistakenly told officers that he "blacked out" but that he meant to say that he freaked out, further explaining that he "was in Special Ed all [his] life" and that he

7

thought the two phrases meant the same thing. After hitting the victim, the [petitioner] went to the corner store to see if he had been shot; he was uncertain because the muffler on the car had a hole in it. That was when he saw "Brittany" run to the body. The [petitioner] said,

> . . . the kindness of my heart, I wanted to go back and help the man that just robbed me and tried to kill me, so immediately I turned the car around right there in the middle of the road and drove to the body. He was turned already over and I reached down. The woman said, "I already called the police and the ambulance." I was like, "Yes, ma'am."

> The [petitioner] grabbed the victim's coat, and it looked like a gun fell out of the victim's pocket; he let the coat go. The [petitioner] said that he wanted to reach for the gun for his safety because he thought the victim was playing. The gun had a "warm sensation on it," and he freaked out; "[a]ll the witnesses [were] looking at [him, and e]verybody out there looking at me." The [petitioner] explained that he already had a black bag in his hand, so he kept it because he did not want anyone to think he was planting anything on the victim. The victim also had a black bag on him containing a white powder, and the [petitioner] apparently took this bag as well. The [petitioner] said that he took the bag to his grandmother's house because he did not want the police to find him with drugs on him. The [petitioner] said that his cousin called and told him that "they're saying [he] so called supposed to have ran over a Gangster Disciple," and the [petitioner] was afraid of what the Gangster Disciples might do to him. He also did not want to go to jail, so he ran.

> The [petitioner] said that he did not want to talk when they interviewed him the first time and that the officers threatened him with life imprisonment. He was given a second interview because officers said they lost the first interview, and the [petitioner] said that he decided to tell them everything he did not tell them in the first statement. The [petitioner] said that officers "popped up" at the jail for the third interview and that they were going around the jail asking people about him.

Id. at *1-6 (footnotes omitted).

On November 22, 2013, the petitioner filed a *pro se* petition for post-conviction relief in which he raised an ineffective assistance of counsel claim. Following the appointment of post-conviction counsel, he filed an amended petition on May 27, 2014,

in which he alleged that trial counsel was ineffective for, among other things, failing to interview or present witnesses at trial, including Brittany Short; failing to request that the victim's clothing be tested for gunshot residue; and failing to impeach the testimony of Sherida Dowell with her prior inconsistent statements. The petitioner additionally alleged that counsel was ineffective on appeal for not challenging the sufficiency of the evidence in support of his aggravated assault conviction.

At the evidentiary hearing, Brittany Short testified that she witnessed the events that gave rise to the victim's death and gave a statement to police but was never contacted by defense counsel or asked to testify at trial. Had she testified at trial, she would have related how she was on her way to the grocery store when she saw the petitioner hit the victim with his car, drive off, return to the scene, exit the vehicle, and remove something from the victim's jacket. She said she did not see the petitioner with a gun and in fact never saw a gun at all. On cross-examination, she acknowledged that in her November 11, 2009 statement, she said she neither saw nor heard a gunshot that evening, either when the petitioner first struck the victim or when he returned to the victim's body. She further acknowledged that Tanika Cook was with her in her vehicle and that Ms. Cook was the one who got out of her vehicle to check on the victim.

Trial counsel, who represented the petitioner at trial and on direct appeal, testified that the defense theory was that the victim shot himself upon impact of the car. He could not recall whether the victim's clothing was tested for gunshot residue. He thought, however, that the firearms expert concluded that there was no gunshot residue on the victim. He said he saw no need to request an independent expert evaluation of the gunshot residue.

Trial counsel testified he made a judgment call not to interview or call Brittany Short as a witness because he thought her account would have added nothing to the case and she appeared "squirrely" and unreliable:

> She didn't see anything. She saw a car come and strike the victim and saw [the petitioner] come back. We had two witnesses on the porch that saw [the petitioner] come back and no shot was fired. Ms. Short concluded no shot was fired, so it was a judgment call on my part. She was squirrely, quite frankly, Ms. Short was. She'd tell Queenie something. That's [the petitioner's] sister, and Queenie would tell me and I'd say, "Well, why would she say that?" I -- so I decided not to use her.

Trial counsel testified that he did not think it was necessary to impeach Sherida Dowell's testimony with her preliminary hearing testimony that she did not know the petitioner because he did not think "she had anything relevant to [the

petitioner's] case at all. It didn't hurt him whatsoever if she testified or if she didn't testify."

Finally, trial counsel testified that he did not raise the sufficiency of the evidence for the aggravated assault conviction as an issue on appeal because he did not think it was a valid issue. On cross-examination, he explained that his theory of the case, given that the petitioner admitted having struck the victim with his car, was that the petitioner essentially committed an aggravated assault but had not killed the victim.

The petitioner testified that trial counsel met with him four to five times before trial, with none of the meetings lasting more than ten minutes. He said they "never really went over the case together," but they did discuss potential witnesses. He said he told counsel that he saw Ms. Short out on the street at the time of the incident and asked him to get in touch with her. Counsel told him, however, that he had spoken with Ms. Short and that she would testify that she saw the petitioner shoot the victim.

On August 11, 2014, the post-conviction court entered an order denying the petition, finding that the petitioner failed to meet his burden of showing that counsel's performance was deficient or that counsel's allegedly deficient performance prejudiced his case. Among other things, the court found that counsel met with the petitioner and his family on multiple occasions, received and reviewed discovery from the State, and made competent, strategic decisions not to use the testimony of Brittany Short, not to seek independent gunshot residue evidence, and not to raise as an issue on appeal the sufficiency of the evidence in support of the aggravated assault conviction. Thereafter, the petitioner filed a timely appeal to this court.

## ANALYSIS

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de*

*novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

The petitioner argues on appeal that counsel was deficient in his representation, thereby prejudicing his case, by not interviewing Ms. Short, not impeaching the trial testimony of Ms. Dowell, not requesting that the victim's clothing be tested for gunshot residue, and not raising the issue of the insufficiency of the evidence in support of his

11

aggravated assault conviction as an issue on appeal. The record, however, fully supports the findings and conclusions of the post-conviction court that the petitioner failed to meet his burden of demonstrating ineffective assistance of counsel with respect to any of these allegations. Counsel explained that Ms. Short's testimony would have been simply cumulative to the testimony of two other witnesses. Moreover, he found her to be "squirrely" by the comments she made to the petitioner's sister. He also offered reasonable explanations as to why he did not seek to have the victim's clothing tested for gunshot residue and why he did not attempt to impeach Ms. Dowell's testimony with her testimony at the preliminary hearing that she did not know the petitioner. Finally, he explained that he saw no point in challenging the sufficiency of the evidence for the aggravated assault conviction, given the petitioner's admission that he drove into the victim and their defense theory of the case that the gun discharged when the victim was impacted by the vehicle. In sum, we conclude that the record supports the post-conviction court's findings and conclusions that the petitioner failed to meet his burden of showing that he was denied the effective assistance of counsel at trial or on appeal.

## <u>CONCLUSION</u>

Based on the foregoing authorities and reasoning, we affirm the judgment of the post-conviction court denying the petition.

_____
ALAN E. GLENN, JUDGE

12